Good morning, your honor. My name is Bill Pearson. I'm here on behalf of the Spokane School District number 81. This case, generally speaking, involves a fire that damaged a portable. The lawsuit was begun on behalf of the school district against a subcontractor who was responsible for fabricating the physical structure that comprised the portable, as well as the manufacturer of a heat pump that was installed for the portable during fabrication, and then delivered to the school district. I think the main issues when you distill everything down on appeal call for this court to decide, first of all, what was the applicable code that was applicable to the construction of the portable involved. If, once the court chooses what the applicable code was, that code indicates what the required clearance was between the heat pump and the actual wooden structure that comprised the portable, and then the last issue, we believe, is whether or not the defendant's expert should have been allowed to give an opinion on the issue of whether or not that amount of clearance would have prevented the fire. The first question, then, is what was the applicable code? The Spokane Public Schools believe that the applicable code was the Washington State Building Code. That actually is a combination of a series of codes, the Uniform Building Code, the Uniform Mechanical Code, the National Electrical Code, all of which we introduced evidence at time of trial that required that when this heat pump was installed to the exterior of the portable, there was to be a one-inch clearance between the heat pump, the metal housing, and a duct that connected the heat pump to the portable. In fact, the heat pump itself and this entire assembly was in the court during the course of trial, and we believe that the testimony induced at trial indicated that there was no clearance between any of the metal associated with the heat pump and the combustible wooden exterior of the portable, and that was the cause of the fire. Now, the trial court did not accept that. The trial court accepted the testimony of Mr. Ron Cooper, who was the president of Northwest Building Systems. Mr. Cooper said that the applicable building code was not the state building code, but was something different, that it was a gold seal or a gold label or something to that effect. And from the moment that issue arose, plaintiffs, Spokane Public Schools, consistently objected to any mention of this gold seal because we claimed it did not exist. We claimed it did not exist because, first and foremost, the defendants could not point to where it was. Mr. Cooper testified by way of affidavit in opposition to a motion for summary judgment and at trial that this gold label-slash-gold seal was actually an alternative building code to the state building code, and that, in fact, the state of Washington, Department of Labor and Industries, had made a decision at some point in time to substitute this gold label, gold seal, building code. We objected to that on the grounds that this building code, this document, was never offered into evidence, it was never presented for consideration, nor was any citation to it ever made. And the trial judge, in deciding that the gold label-slash-gold seal was the applicable building code, gave a citation to a Washington administrative code section, section 296-150F. Now, the primary problem with citation to that was the fact that that particular administrative regulation was, first of all, enacted in 1996. The portable itself and all of the installation work took place in 1992. So what the trial judge was alluding to hadn't been in existence at the time that the portable itself was fabricated. Secondly, 296-150F of the Washington administrative code said that the state building code was the applicable code to apply to the fabrication of this portable. And furthermore, there is no provision in WAC 296-150F for any sort of variance procedure or any means whereby the Washington State Department of Labor and Industries can decide it's going to supplant the state building code with something different, which is precisely what Mr. Cooper testified was what happened. Now, we believe, first of all, that under the best evidence rule in this Court's decision in United States v. Bennett, that if the defendant wanted to introduce any evidence of this gold label-slash-gold seal, it had to actually introduce a writing that demonstrated that such a code existed. The only evidence that it existed was testimony by Mr. Cooper at trial that he saw it, that he saw this thing he called the gold label-gold seal, and that he had seen some sort of paperwork associated with a variance that said, no, when we made this portable, we didn't need to install it or construct it with this one-inch clearance. The variance that I saw said we could do it with a zero clearance. The plaintiff objected to that on several grounds, one of which was, if there is such a thing, please produce it, either show us the document or give us a citation. And secondly, we pointed out to the Court that there was no provision in the Washington State Administrative Code that allowed for that. Now, the one retort to that in the briefing from Northwest Building Systems is that WAC 296-150F was preceded by a previous administrative regulation, 296-150A. But they do not, I believe their briefing states that they believe that 150A and its contents were the same as what is now presently in 150F. This Court, as a matter of law, can review the administrative regulations, look at the language, and determine what they believe the requirements of the WAC 150-F provide. I believe the defendants claim that 150A says the same thing. Our point is there's no indication that anything but the State, the Washington State Building Code applies, and that would require a one-inch clearance. And second of all, there's no provision whereby that requirement can be varied by a State agency or anyone else. And furthermore, if, in fact, there was something different, that that should have been demonstrated by the presentation of a document to that effect. Not a witness testifying in court that he, at some point in time, saw something that indicated something different. The best evidence of what the law required was a writing, and we claim that that writing did not exist. There was no citation to something any different from what we demonstrated, in fact, was what we believe the law to be. But the law at the time that this portable was fabricated stated that the applicable building code was the Washington State Building Code, that under that, under the provisions of that, a one-inch clearance was required, and that had that one-inch clearance been what had, in fact, how this portable had been built, this fire would never have happened. Now, the next question, and I think of equal importance. Let me back up for a moment. First of all, I'm sorry. I meant to reserve five minutes for rebuttal. I apologize. You have the clock. You just keep your own time. Thank you. The next question had to do with whether or not the defense expert should have been And we believe that he should not have been allowed to testify in that respect. The Daubert-Kumho-Joiner trilogy of cases, I think, has made it very apparent that in Federal courts, in terms of insisting upon reliability on the part of experts, Federal courts will demand that experts before they're allowed to give an opinion what their methodology was or is in arriving at a particular opinion. And we contend that the methodology employed by the defense expert in this particular case was simply to say, I don't believe any degree of clearance would have prevented this fire. He specifically admitted at trial that he had made no calculations, that he had not done any testing. That he had not referenced any sort of literature in the fire science community to buttress his opinion that, whether we're talking about 12 inches, 6 inches, or 0 inches, would have made any particular difference. He basically said in his experience as a chemical engineer and based on general principles of thermodynamics, he did not believe that any degree of clearance would have prevented this fire. And it was our contention on summary judgment as well as at trial that that sort of methodology, that, well, based on my experience, I don't think this would have happened, is not a reliable type of methodology that meets the requirements under the Daubert trilogy of cases. And therefore, his opinions should not have been admitted at trial. Now, with respect to what the import of all that is, there were several liability – I'm sorry. There were several product liability claims brought against each defendant. Before you – you've only got three and a half minutes before you reach your five. Do you want to discuss the question of the intervening? The intervening superseding cause, yes. The Uniform Mechanical Code required that a label be placed on the heat pump when it was shipped from the manufacturer and that that label basically identified the clearance that that heat pump was to have from any combustibles when it was installed to anything. When it was shipped, this particular heat pump, when it was shipped from the factory, had no information on that label. It then went to a distributor in Boise, Idaho. And from that distributor, it was then delivered to the fabrication – the fabrication building for Northwest Building Systems, apparently without any written installation instructions. The defendants claimed that it was – it was unforeseeable that that would happen. And therefore, that there was an intervening negligence on the part of the distributor, Wesco, in not providing the installation instructions from the journey from the factory to the – I'm sorry, from the Nordyne factory to Boise, where the portable was fabricated, that would tell the fabricators how to install this heat pump. It was our contention that this was most definitely foreseeable, meaning it would not be an intervening cause, because the Uniform Mechanical Code had obviously anticipated this might happen and mandated that a label containing the clearance information actually be placed on the unit. So when the unit was lifted up and installed with the portable, the people that were doing it would look right at the clearance information on the unit that would have told them what the clearance was, the same information that supposedly was contained in the installation instructions, that for whatever reason did not make it with the heat pump. And for that reason, we did not believe that the claim that the installation instructions were somehow lost and not provided to the installer was unforeseeable and therefore an intervening cause, because it had been anticipated by the code such that when this heat pump left the factory, it was supposed to have a label that had the same information that could not have been lost, not have been placed by the distributor, and would have actually been on the unit when it was. What about the modification of the heat pump? The modification of the heat pump, it was, first of all, it was undisputed at time of trial that those modifications were off at the time of the fire. From an electrical standpoint, you can't have an electrical fire unless something is electrically turned on. It was undisputed that what had been added was off. And therefore, we contended if it wasn't, if it was off, it couldn't have contributed to the fire. Furthermore, I realize I have 30 seconds left, but the key to all this is that you had a switch that ran through a protective device to a heater that then had a fan. Going to the question that you raised about the alteration to the unit, the key factor here was the reason this fire happened was because a fan that was the original equipment that came with the heat pump was off at the time of the fire. It was undisputed from the testimony by all experts, both experts at the trial, that the original switch, the plaintiff's claim failed, is what not only it turned off the fan, and that it wasn't supposed to do that, and that had everything that the defendants claimed had been done wrong by the plaintiffs in modifying the heat pump. If all of that caused the unit to operate at full blast, as long as that fan was running, this fire wouldn't have happened. The key chain in the link of causation was the fact that that fan was turned off, and that was attributable to a switch that we claim was defective. That was the responsibility of the defendants. I'll stop at this point. Thank you, Judge. May it please the Court. My name is Andrew Vorenson. I'm here on behalf of Northwest Building Systems, and it's an honor to be back before the Ninth Circuit again. I want to touch upon, and I'm dividing my time with Mr. Stocker, so I'll be limited and rely heavily upon my brief. Simply put, the starting point is this case was tried to the trial court, not to a jury. The late Judge Leavitt heard every single phase of this proceeding. He oversaw the admission of evidence, discovery issues. He oversaw motions for summary judgment. He sat through the trial, heard every witness, had the opportunity to personally and what was persuasive. Judge Leavitt entered 73 findings of fact based upon the evidence. I would point out that not one single offering from counsel was rejected. Every piece of evidence he chose to put before the trial court, he was permitted to do. The standard for review of evidentiary rulings needs no discussion. You're well versed in that, as you are in terms of findings and facts and conclusions of law. But if you look at the brief submitted by the appellant in this case, he relies entirely upon the testimony of an expert that Judge Leavitt not only found to be without credibility, not only found to be unpersuasive, but went on to state something I have never seen in my career as an attorney, an admonition that the court has serious concerns over Mr. Kilgore's testimony as it relates to a one-inch clearance. And, well, he should. I believe that any issues counsel talks about as far as the summary judgment motion, I'm not going to address it beyond what I put in my brief. That's moot. The trial court had one of the longest Daubert hearings in history. It was a five-day jury trial. He didn't need to do that, but he chose to hear. On the Daubert issue, I'll just simply suffice to say this. My expert, Mr. Harris, he had the court had before him his education, training, and experience. Counsel says he did nothing. To the contrary, he met with plaintiff's expert. They examined the sequencer that counsel referenced. Everything was intact and fine. They were to get back together again. Mr. Kilgore was to contact my expert for X-ray examination and further testing. Mr. Kilgore destroys the sequencer. The evidence is that it was destroyed deliberately. There was evidence that it was destroyed deliberately. We filed a spoliation motion before the trial court. That's an example where the court let everything in. The evidence we presented said when my expert last saw it, it was intact, it was just fine. Mr. Kilgore, for reasons unknown, never contacted anyone, handles it, and he says it falls apart in his hands. But Mr. Harris did far more than that, right, at that location. He's not foreign to the subject of fire investigation. He went to the school district along with Ron Cooper. He examined all of these modular units, and what did he find? Of the four that they had maintained well enough to be working, he tested them. This was after a rebuild. He would not take it to the condition it was in at the time of the fire because you ran the risk of having another fire, which is the fan. But with the fan running, he obtained temperatures near the combustion level. He got up to 280 degrees. 300 is considered combustible. So to say that he didn't have a criteria to say without a fan, and the only thing that was undisputed to the court was the fact that without a fan and there was not an agreement that only two units were running on the modification, all four were running. And the reason we know this is that not only did the sequencer fail, but by virtue of their modification, a device called the high limit switch failed. A high limit switch is a safety device. And what it does is the normal range for these heat units, when it gets to 170, that's all the further they want them to go. And then you cool it. The sequencer kicks in. I'm not an electrician. But it brings the temperature back down. A high limit switch should never, ever, ever activate. It is a backup safety device. When they doubled the heating unit capability, four 5kW strips, that caused the sequencer to constantly be cycling and the high limit switch to constantly be cycling. They wore out. When they both failed, the fan doesn't work, and the temperatures now will reach at the base of the heater will rise as high as 1,200 degrees. And in an enclosed area where a roof, you're going to get temperatures between 5 and 800 degrees within moments, with a combustion level 3 to 400 degrees, I believe the testimony was. When they doubled this, when did that occur? 1996, Your Honor. We first learned of it when we went to the site with my expert, Mr. Harris. And we opened up the back, the electrical part of the heat pumps, and here was a schematic that came with the heat pump. And written across the top, and it was an attachment in the record that I provided to you, it says modified 1996. In addition to that modification, the school district denied ever removing the units from the buildings. And yet, the overwhelming evidence was that you could see the destructive physical evidence present that they had done this during the 1996 modification. The plenums were bent and misconfigured, which cannot happen under the way these are manufactured. And I'll get into that when I discuss the gold label in a few moments. In addition to that, we found that, remember, the high limit switch, that's your safety device, okay? They knew they had a problem when they voided the UL and they doubled the heat capacity because they went back on some units and put in a third high limit switch. Came with one, they added one, and they had an overheating problem, and they added a third to the majority of these modified units. They didn't do that at Indian Trail, and we don't know why. It still was out of code. It wasn't UL compliant, and this was the result of it. The testimony, as far as the experts, Mr. Harris surmised, because of this constant recycling in a continuous failure mode starting in 1996, we had the sequencer fail, the high limit switch failed, which allowed the temperatures from all four KWs to rise to these unbelievably hot temperatures, well beyond the combustion point. That heat is trapped within a roof configuration, and whether you had one-inch clearance or three or four or even five-inch clearance would not have made a difference. Counsel said that the switches were off, and therefore it couldn't have been a result of the modifications. With all due respect to Mr. Pearson, absolute pure poppycock. He didn't mention to you that the school district sent out workers five days before this fire, two sets of them, that was a Friday, to restore heat, and they did. They came back on Monday, Tuesday, Wednesday, Thursday, and they were fooling with this piece of equipment, and heat was maintained. They didn't come back on Friday, but the teacher in the room looking at the thermostat, they're like so many of ours in our homes. You have a dial and you have lights. What she noticed was this is strange. The switches are off, but the light for emergency heat and auxiliary heat are on. Did she report that? No, she did not. And within 10 hours, that building was ash. Mr. Harris stated that with those two lights on and the switch off, that established, in his mind as an expert, that all four heat elements were running, and it did make a difference. And as to that testimony, Judge Levitt said it is persuasive, it is credible, and the last thing he pointed out, and I think, you know, one thing I enjoy about being a trial lawyer is I'm not an electrician. I don't try to be. If you judges are far more qualified than me, you can hit me with questions, and I just shake my head. But one example I loved, Mr. Kilgore's big test, and this is, I think, what the court was going to with concern in addition to destroying evidence. He reconstructs what he says to prove a one-inch clearance to make a difference, but he leaves off the rough. And Mr. Harris explained, that's like cooking Thanksgiving dinner, folks, with the oven door open. It's going to have a lot of hungry family members because it's never going to cook. When I asked Mr. Kilgore about that, all of a sudden I heard a doctrine that no one else had heard about. Well, that's explained by thermal infinity. I should have asked my grandson who could have told me about Buzz Lightyear or whatever it is. He knows something about infinity. But the evidence was there's no such theory. You have to give credence to Judge Levitt. He heard the evidence. Let me address real quickly, if I might. How much time do I have left? Ten minutes. All right. I've got two minutes, and it's a quick version of the Washington Gold Label. A lot briefer than I would have been, and I would ask you to go to my brief. Counsel never has got it. It is not a code. It is a process. It is a process sanctioned by RCW 43-22-480. It's specifically limited to modular homes because they're manufactured and moved across state lines. It's a process where you can have variances in national codes if submitted to the states, and they are approved. So there's not a code like OSHA to put in front of you. What's fascinating is the school district hires Northwest architects to design the plans and specifications. What do they specify? His people, Washington Gold Label. They hire Jelko, a non-party, as a general contractor. What do they specify to my people? Washington Gold Label. And yet it wasn't until the last day of trial that counsel finally had to say there is something called the Washington Gold Label. His expert never made a single attempt to determine what it was. Mr. Cooper and his partner founded the Washington Gold Label. They helped create it in 1982. There was a miscite in terms to the procedure. But Mr. Cooper testified for over a day about the process for obtaining the variance. Jelko does detailed engineering drawings seeking variances from national codes. 43-2280 states, and I quote, the national building codes are to be considered, not adopted, considered so far as practical. The Washington Gold Label allows someone like Jelko to say for these types of homes, a one-inch clearance is not necessary. And they got a one and they were granted a zero clearance. Mr. Cooper sat on the board that adopted that. He's been on the board since the early 1980s all the way up to the present. He went through the procedure utilized, and when Mr. Pearson cross-examined him Monday morning, he had these procedures to obtain variances. If he wanted to argue in trial or here that that's a fabricated code, why didn't he call his own architect who specified Washington Gold Label? That's a question I have. Somebody from Northwest Architects. Why didn't he contact Jelko, who specified to my people Washington Gold Label? The evidence was overwhelming. And as far as superseding intervening cause, I think I've already addressed it. If I've fallen short and you have a question that I can respond to, I want to afford a little counsel a few minutes. Thank you, counsel. Thank you very much. Good morning, Your Honors. My name is Steve Stocker. I'm here on behalf of Nordyne Incorporated, the manufacturer of the heat pump in this matter. Very briefly, failure to warn. Plaintiff's claim against Nordyne that we didn't have this label on the side of the heat pump and, therefore, somehow that contributed to this cause. Judge Levitt appropriately found after listening to all the evidence. That's a red herring. Reason why? Plaintiff can't have it both ways. On one hand, they're arguing that Northwest Building Systems somehow didn't put in a one-inch clearance as required by national code. They're saying they should have followed the National Electrical Code, the National Mechanical Code, the National Building Code. And yet they're saying our failure to put a strip of paper on the side of the unit saying you should build to the national code of one inch somehow was the cause of Northwest Building Systems not doing that. As four days of testimony elicited, Northwest Building System was building to the contract requirements, which was Washington Gold labeled. And that was a variance of the one-inch clearance. It's undisputed that Nordyne recommends in their installation instructions that there be a one-inch clearance. So how the fact that our installation instructions weren't followed on intentional purpose by the manufacturer, what Judge Levitt found is there's no causation. Appropriately so. That's an appropriate legal conclusion based upon the evidence presented by the plaintiffs that somehow it should have been followed. Additionally, failure to warn, who didn't we warn? It was undisputed that our instructions went with our product. They're put in the control cabinet in a plastic sleeve. They went to the distributor. What's unknown here is why did the distributor then take them out, separate the two, send then the heat pump unpackaged to Northwest Building Systems? Plaintiffs never included the distributor. Plaintiffs never deposed anybody from the distributor. They never inquired as to that question of how did these get separated. What Judge Levitt determined based upon the law that was in the briefs that he reviewed is the manufacturer has the legal right to assume that if it appropriately warns the end product user that those instructions are going to be read. Well, in this case, we sent the installation instructions. That was agreed upon, undisputed with the plaintiffs. Therefore, that's where he found intervening cause is that it was unreasonable to assume that somehow somebody's negligence in not keeping the installation instruction, the product information with the product, was somehow foreseeable to us, Nordheim, that we should have taken some action. But aside from that, you still don't even get to intervening cause on failure to warn because of their argument that there should have been a one-inch clearance by national code. Then followed by Northwest Building's statement that we didn't build to the national code because we built to the contract specifications that were given to us, which was Washington Gold Label. Therefore, you know, Nordheim has no causation in the sense of why was one-inch not built. Defective design. The essence of Judge Levitt's ruling of defective design was he didn't believe the plaintiff's expert's testimony as to how this fire occurred. What he found, and all agreed, this was a U.L. listed product, U.L. listed instructions. It had performed appropriately for ten years. And when the sequencer was first inspected in the plaintiff's expert's office, along with the engineer from Northwest Building Systems, what they found is the sequencer appeared to be intact. It had electrical continuity over the switches that indicated that it was working appropriately. And yet, later, Mr. Kilgore determines that, no, it didn't. It fell apart. But before it fell apart, I determined that there was 125 thousandths of an inch gap in between these pins that activate this switch, and that that was the cause of this fire, because one pin was out of place and it allowed the heating elements to come on without the fan coming on. Judge Levitt, in considering that testimony, along with the rest of the testimony, along with the teacher testifying that the unit worked the day before the fire, and it worked in a manner that Judge Levitt determined, based upon the testimony, that it couldn't have been working if it failed in the manner that plaintiff's expert said. And so he gave no credibility to the testimony of plaintiff's expert. That was his right. He was the trier of fact. He had heard all the evidence. And so what he found is that there was, again, no causation. He didn't believe the theory espoused by the plaintiff's expert. He believed the theory espoused by Northwest Building Systems' expert. I chose not even to put my expert on because of the state of the testimony at that point in time and moved for a directed verdict, which he then deferred until he heard all the evidence. Further on defective design, he just went on to note, then, that we have the modification. The school district doubled the heating capacity of our unit, took it out of our UL listing. Everybody agreed that shouldn't have been done. And what's interesting is after all this came out, after Mr. Kilgore, the plaintiff's expert, was involved, after Mr. Harris, Northwest Building Systems' expert, was involved, the school district made a determination what to do with their retrofit program. How are we going to correct this? What did they do? They returned the Nordyne heat pump wiring schematic to the exact same schematic that it was when it left the factory. And it has since continued to work with no problem, no additional fires, and the product was returned to the state in which we shipped it to the consumer. And Judge Levitt determined that that showed it was not a defective design. Thank you, Your Honors. That's all I have to add. Thank you, counsel. And I have one question before you start. Your opposing counsel says that when they were given their instructions under the contract and the specifications, that they were told to build according to goal label. Do you disagree with that? That these would be the installers of the heat pump on the portable? In other words, if I understand the question, do we disagree with the claim that the people who actually installed the heat pump at the factory, at Northwest Building Systems, were instructed to do so in accordance with the goal label? Do we contest that? Is that the question? Well, I had the impression that those instructions came with your authorization. I think the contention by defendants is that that was specified by a general contractor that the public schools contracted with. And then somehow the general contractor communicated that specification to their installers. And the answer is yes, we do contest that. Because the only evidence of that was Mr. Cooper, who, as we point out, admitted he had no personal knowledge concerning how this portable was fabricated and had no personal knowledge of what exactly the contract requirements for this portable were. So the contention is, we believe, without foundation, that there's no witness or no document that would indicate that this particular portable was to be fabricated according to the gold label. Briefly, let's start with the argument that the gold label or the gold seal is a process rather than a building code. At trial, at page 898 of the trial transcript, Mr. Cooper, the president of Northwest Building Systems, was asked a question. Your affidavit, again filed with the court on December 29, 2005, which I believe you have in front of you at paragraph 6, it says, the Washington gold label was actually an adopted building code that governs our business. Answer which paragraph was that question? I'm sorry. Answer which paragraph question? Paragraph 6. Answer yes. Question now. When you say it's actually an adopted building code that governs our business, who is it, to the best of your knowledge, who actually adopts this code? Answer. To the best of my knowledge, it would be the state of Washington, whether it's through the Department of Labor and Industries, Department of Manufacturing, Housing, or another entity, I'm not sure. The point is, is that we're not talking about a process as contended by counsel. We're talking about a supposed building code which has never been presented, which has never been cited to, and which supposedly had a variance procedure that allowed this particular unit to be constructed contrary to the state of Washington building code, which incorporated by reference the National Electrical Code and the Uniform Mechanical Code, which said there was supposed to be a one-inch clearance, whether it's a simple review of the applicable administrative regulations or an application of the best evidence rule. We don't believe that any evidence under this gold label should have been considered by the trial court. Second of all, with respect to the question as to whether or not the sequencer was effective, which apparently it's now contended, was never determined because of the actions on the part of plaintiff's expert. Point out to the court, and I think it's undisputed in the briefing, their expert actually agreed with our expert that the sequencer was defective. That was undisputed at trial. His issue, defense expert, was whether or not the lack of clearance had anything to do with this particular fire, and that's where we believe his testimony should have been excluded. But Mr. Harris, their expert, never disagreed with our expert, Mr. Kilbegor, that the sequencer involved was defective. Now, with respect to the modification, there was a question from the court, and I think it's a very good question, and that was how many parts of this machine was on at the time of the fire. Now, it's the contention of the defendants and their experts that our modification turned off some protective switches. All right? Now, those protective switches supposedly would keep this unit from overheating. The way these protective switches work is if they activate, which they claimed they did, they turn the heater off. So if what we did did what they believe it did, which was we stuck something in which caused all of these protective devices to stop working, this unit should not have been on at the time of the fire. But we know something was on because we had a fire. Something electrically had to be going in order to produce the necessary conditions to start a fire. If what we did compromised the protective devices, this unit should have been shut off. It was not. Our expert testified, and I believe the trial transcript will back this up, that as a result of his review of the physical evidence, there was only one heating unit on. And it was on because a sequencer, a switch to turn it on and off, was defective and had failed. And it failed in such a fashion that it not only allowed one heater to keep working, but it turned off the fan. Was that sequencer ever tested at any time after the fire? It was tested in such a fashion. It was tested not as completely as I believe the defense would like, but it was examined. There's a difference between examining and testing. Your Honor, there are certain tests that were conducted on it for purposes of conductivity in terms to see how well it was able to move electricity. Was there evidence of that in the record? There was a trial, yes. It's part of the trial transcript. It was testified to by both Mr. Kilgore and, I believe, Mr. Harris. Thank you, Your Honor. Thank you, counsel. Case just arguably submitted. Thank you both very much. Court will stand adjourned for the day.
judges: Reinhardt, Paez, Strom